[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Petitioner, the Department of Children and Families (DCF), filed petitions on April 8, 1996 to terminate parental rights with respect to the minor children Devon S. (D.O.B. April 10, 1993) and Luvonia S. (D.O.B. July 1, 1994). The petitions were filed at the Superior Court for Juvenile Matters in Waterbury, and the case was subsequently transferred to this CT Page 8947 venue for trial. DCF seeks to terminate the parental rights of the children's natural mother, Caprice S., and of their natural father, Willie S. (The parents were never married to each other.)
Pursuant to the applicable sections of C.G.S. § 17a-112, DCF has alleged in both petitions the statutory grounds for termination of abandonment, failure to rehabilitate, and parental acts of omission or commission which have denied the children the care, guidance or control necessary for their physical, educational, moral or emotional well-being. The petitioner has also alleged, with respect to each count plead, that all of the grounds for termination have existed for not less than one year prior to the commencement of this action.
PROCEDURAL HISTORY
This matter originally came to the court on October 3, 1994 when DCF filed neglect petitions concerning Devon and Luvonia at the Superior Court for Juvenile Matters in Waterbury. On November 1, 1994, DCF sought and received ex parte orders of temporary custody of the children from that court. The OTCs were subsequently continued without prejudice by agreement of the parties at a hearing there on November 15, 1994. On December 20, 1994, following nolo contendere pleas by each parent, Devon and Luvonia were adjudicated neglected children and committed to the petitioner's care and custody for a period of 18 months. At that hearing, both the mother and father signed court-approved expectations which are discussed at greater length elsewhere in this decision. On May 8, 1996, pursuant to an agreement of the parties, the court extended each child's commitment until conclusion of the TPR trial.
Prior to the commencement of trial, the petitioner filed a motion for an order compelling disclosure of records related to respondents' treatment for substance abuse. Pursuant to the provisions of 42 U.S.C. § 290 dd-3, et sequitur, and the holding ofIn re Romance M., 30 Conn. App. 839 (1993), the court conducted a hearing on that motion. After hearing, and over the objection of each respondent, the court ruled that certain records, and evidence and testimony related to certain aspects of each parent's substance abuse treatment, could be introduced into evidence at trial.
The trial on the termination petitions began on July 16, 1996 and was subsequently continued for hearing on July 17, October CT Page 8948 18, and October 21, when the matter concluded. Both parents were present in court on each day of the trial. DCF, the minor child, and both parents were represented by their respective counsel throughout the proceeding.
DCF introduced the testimony of the following witnesses at trial:
1. Nicole McKelvey, DCF social worker;
2. Sally Ward, parent aid, St. Mary's Hospital;
 3. Thomas Mallory, New Opportunities for Waterbury, Inc.;
4. Almy Ciaffaglione, Morris Foundation;
5. Cheryl Planten, Joseph Center;
6. Sheila R., the children's foster parent.
Neither parent, nor counsel for the minor child, offered testimony during the proceeding.
FINDINGS OF FACT
The court, having carefully considered all of the evidence and testimony adduced at trial, makes the following findings of fact:
Devon and Luvonia were committed to DCF on December 20, 1994. The neglect petitions which were the basis for those commitments alleged that each parent allowed the two children to live under neglectful circumstances, and had failed to properly care for them. Among the specific allegations were claims that the parents had left Devon unattended, failed to properly provide for the children's medical needs, and allowed Devon and Luvonia to live in an apartment which was at times unheated, filthy and unsanitary. DCF also cited several incidents prior to the order of temporary custody when the parents either improperly fed the two young children, or had inadequate food for them in the apartment.
On the date of commitment, Caprice S. and Willie S. signed court-approved "expectation" forms, which spelled out what would CT Page 8949 be required of them in order to achieve reunification with Devon and Luvonia. (Petitioner's Exhibits 19A and 19B). Among the expectations to which the father agreed were conditions that he participate in individual and drug/alcohol counseling, follow the recommendations of those counselors, refrain from substance abuse, secure and maintain adequate housing and income, and have no further involvement with the criminal justice system. (Petitioner's Exhibit 19A). In the expectation form which she signed, the mother agreed, inter alia, to participate in individual counseling, to follow the recommendations of the counselor, to refrain from substance abuse, and to secure and maintain adequate income and housing. (Petitioner's 19B).
Both parents had substance abuse problems around the time of commitment which clearly interfered with their ability to properly care for Devon and Luvonia. It is also clear that both mother and father understood then that reunification with the children depended, to a large degree, on their capacity to overcome those drug/alcohol problems. A DCF treatment plan dated February 12, 1995 notes that: "Mother is honest and aware that her substance abuse is an on-going problem." (Petitioner's Exhibit 2, Page 2). It also states that at "the present time [mother] is attending the Joseph Center out-patient drug program and presents as doing well. [Mother's] ability to remain substance free is directly related to [whether] or not she will be reunified with her children" (Petitioner's Exhibit 2, Page 5). The family treatment plan, a copy of which was sent to both respondents, also indicated that each parent was expected to refrain from substance abuse, maintain appropriate housing, receive on-going, consistent treatment for his or her substance abuse, and "follow through in order to meet the children's needs in a timely manner." (Petitioner's Exhibit 2, Page 5). DCF signed service agreements with each parent on February 14, 1995. (Petitioner's Exhibits 3 and 5). In the document which the father signed, he agreed to abstain from alcohol use and drug use. (Petitioner's Exhibit 5). The mother promised DCF that she would attend Joseph Center, remain drug and alcohol free, and obtain new housing with the assistance of a family preservation program operated by New Opportunities for Waterbury, Inc. (NOW). (Petitioner's Exhibit 3). DCF had requested the last expectation due to its belief that the neighborhood in which the mother lived had a large number of drug users and sellers. The petitioner believed that the mother's chances of remaining substance-free would be increased if she relocated from this environment. CT Page 8950
During the period of approximately 15 months which transpired between the date of commitment until the filing of the TPR petitions, DCF provided both parents with numerous opportunities to get the treatment which they needed to conquer their substance abuse.
The father was referred by DCF to the Morris Foundation in Waterbury and underwent an evaluation there on October 13, 1995. He admitted having a substance abuse problem and was diagnosed with alcohol, marijuana and cocaine dependency. (Testimony of Almy Ciaffaglione). An intake data sheet compiled by Morris Foundation then indicated that the father had last used cocaine three weeks earlier, and was consuming $100 worth of that narcotic substance per week around that time. (Petitioner's Exhibit 25B). Based on the evaluation, the father was admitted for substance abuse treatment at the foundation. (Petitioner's Exhibit 25). He was supposed to attend an hour-long group session there two times per week. The Morris Foundation recommended that Willie S. first enter out-patient treatment, with the understanding that he would thereafter be referred for in-patient services if the out-patient program was not successful. A drug screen test of the father on October 13 was positive for marijuana, but negative for all other drugs. The father failed to attend the out-patient group which was scheduled for October 17, but left a message saying he was at work. He was present there on October 19, and October 24, but once again failed to appear or call with an excuse on October 26, October 31, November 2 or November 7, 1995. He was informally discharged from the program in November 1995 as the result of his failure since October 24 to attend sessions. (Testimony of Almy Ciaffaglione).
Willie S. sought readmission to the Morris Foundation in February, 1996. According to Almy Ciaffaglione, who is a drug and alcohol counselor there, the respondent was told he could attend group sessions. However, he indicated that those sessions would interfere with his work schedule, and requested individual substance abuse treatment. The foundation requested that father provide verification of his employment, but he failed to do so. Despite this, Morris Foundation acceded to the respondent's request and indicated that they would provide the individual sessions which he had requested. Despite this accommodation, father never returned for any treatment, and was again discharged from the Morris Foundation program for non-attendance.
Caprice S. began substance abuse treatment at the Joseph CT Page 8951 Center, a facility operated by St. Mary's Hospital in Waterbury, on December 20, 1994. After an evaluation there, she was diagnosed with cocaine dependency and alcohol and marijuana abuse. (Testimony of Cheryl Planten). She then commenced a partial hospitalization program, but on January 17, 1995 was returned to the evaluation unit after relapsing twice. (Petitioner's Exhibit 26A). The mother was readmitted to the five-week evening partial hospitalization on January 25. Her attendance in that program was appropriate until March 1, 1995 when she stopped attending and was discharged. She was readmitted to the Joseph Center's evaluation unit on March 21 and remained in treatment until April 13, when she was again discharged for missing two appointments without excuse. (Petitioner's Exhibit 26A). The mother has not received any other treatment at Joseph Center since her discharge in April 1995.
On April 26, 1995, Caprice S. was admitted to the Morris Foundation's out-patient program with a diagnosis of cocaine and marijuana dependency. (Testimony of Almy Ciaffaglione). She was enrolled in that program's early recovery phase and was supposed to attend sessions there three times a week for two months. Caprice S. stopped attending — without explanation — on May 5, 1995.
The mother returned to Morris Foundation and was readmitted for treatment in the early recovery group on June 12, 1995. Her attendance record was positive until early July. She stopped attending on July 3, and was discharged yet again. The mother returned to the program on July 18, was readmitted, and was told by program officials to attend every day. Although she initially missed several sessions, the Morris Foundation noted considerable improvement in the respondent's attitude and attendance during late July, August and September. She documented attendance at AA and NA meetings during this period, and she often attended both morning and evening groups. Ms. Ciaffaglione testified that mother admitted using marijuana and drinking beer on September 1. On October 4, Morris Foundation learned that a drug test which mother was given on September 27 was positive for cocaine and marijuana. A second urine screen which was administered on October 11, 1995 indicated marijuana use by the respondent. Almy Ciaffaglione of the Morris Foundation staff testified that on November 9, 1995, Caprice S. admitted to program personnel that she had not been honest with them about her continued drug use, and that she wanted to enter a three-day residential social detoxification center which is also operated by the foundation. CT Page 8952 The mother went to the center, but thereafter did not return to the out-patient program. She was once again discharged for non-attendance on November 7, 1995.
On February 28, 1996, Caprice S. again requested treatment from Morris Foundation and was admitted to an after care program there with a diagnosis of cocaine and alcohol dependency. Ms. Ciaffaglione testified that mother was referred to the program by local welfare officials with the threat that mother's benefits would be terminated unless she got treatment. Not surprisingly, the mother's participation was once again only sporadic. She attended sessions at Morris Foundation on February 28 and 29, but failed to appear on March 6 and March 14. On March 25, mother attended sessions of a more intensive out-patient program at Morris Foundation. She missed without excuse the very next day, was present on March 27 and March 28, and arrived an hour late on April 1. The mother returned the following day, but failed to attend on April 3 and April 4. Ms. Ciaffaglione met with the respondent on April 8 to admonish her about her attendance, but on April 16 the mother was discharged — for the final time — for excessive absences.
Nicole McKelvey, one of the DCF social workers assigned to Devon and Luvonia's cases, also testified at trial. She testified that Caprice S. failed to attend a March 7, 1995 administrative review conducted about the children's case by DCF. The mother later admitted to Ms. McKelvey that she missed the meeting because she had taken "a dime bag of cocaine" after a fight with the children's father. On this occasion, the mother told the worker that she wanted to receive inpatient treatment for substance abuse. Ms. McKelvey advised the respondent to seek referrals from the Joseph Center, where she was then enrolled in treatment.
According to Ms. McKelvey, DCF also provided mother with the services of an intensive family preservation program operated by an agency known as New Opportunities for Waterbury, Inc. (NOW). Workers from that agency were available to Caprice S. on a 24-hour-a-day basis from December 8, 1994 until March 9, 1995. (Petitioner's Exhibit 23). Thomas Mallory, a supervisor with that program, testified that one of NOW's main objectives in this case was to assist Caprice S. in obtaining new housing so that she could relocate from her "present environment." NOW has a housing assistance unit and was prepared to offer the respondent financial assistance with a security deposit on a new apartment. CT Page 8953 Caprice S. viewed one or two apartments during the 12-week period that NOW was involved her case, but did not relocate as she had promised DCF she would.
In October 1995, DCF referred the father to a parenting class program for recovering substance abusers which was operated by a program know as Family Ties. This program has a "socialization component" which allows parents to interact with their children. Willie S. attended six of the 10 classes and one socialization session, where he interacted very well with the children. However, he did not successfully complete the Family Ties program. (Testimony of Nicole McKelvey.)
As noted infra, one of the court-approved expectations to which the father agreed at the time of Devon and Luvonia's commitment was a condition that he have no further involvement with the criminal justice system. A Connecticut State Police record introduced into evidence at trial indicated that Willie S. was charged with threatening (C.G.S. § 53a-62) as the result of an incident which occurred on April 28, 1995 in Waterbury. (Petitioner's Exhibit 7). He was convicted on a substituted charge of breach of the peace (C.G.S. § 53a-181) in connection with that matter on June 30, 1995, and received a six-month suspended sentence and one year conditional discharge as his penalty.
Both parents complied with the expectation that they visit their children as often as DCF permitted. Mother and father at first visited Devon and Luvonia at the DCF office. In February 1995, visits were allowed at the mother's apartment, under the proviso that the apartment would be tidy when the children went there. In April 1995, DCF moved the visitation site to the home of a parental friend, or to a park near the DCF offices. Ms McKlevey explained that DCF made the shift due to its concern that the mother was not complying with its requirements about substance abuse. She also testified that DCF subsequently required that the parental visits again take place in the DCF offices, because father had allegedly been drinking intoxicants during a couple of the visits. The social worker stated that both Willie S. And Caprice S. had, for the most part, been "very consistent" in their visitation with Devon and Luvonia, and had interacted appropriately with the children.
As a result of both parent's inability to successfully complete substance abuse treatment and to achieve the other CT Page 8954 expectations referred to above, Ms. McKelvey met with Willie S. and Caprice S. on November 17, 1995. She advised them on that date that DCF had reconsidered its plan to reunify the children with the family, and was now recommending termination of parental rights. Ms. McKelvey explained to both the mother and the father "what needed to be done" if they wished to avert a TPR filing. She subsequently delayed submitting the termination paperwork for an additional three months, in hopes that the additional time would enable the parents to effectuate the necessary changes. Despite the social worker's exhortation, and delay, both parents failed to take advantage of the services and treatment which could have facilitated their reunification with Devon and Luvonia.
ADJUDICATION (based on facts as of April 8, 1996)
DCF has alleged three statutory grounds for termination in this case. The court will first consider the allegation of abandonment, and the allegation that the respondents engaged in acts of commission or omission which have denied the children the care, guidance or control necessary for their physical, educational, moral or emotional well being.
C.G.S. § 17a-112 (b)(1) provides that a child is abandoned if his or her parent has "failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." "Where a parent fails to visit a child, fails to display any love or affection for the child, and no concern for the child's welfare, statutory abandonment has occurred." In re Juvenile Appeal, 183 Conn. 11, 438 A.2d 801
(1981). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of interest, concern or responsibility for the welfare of a child." In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985).
The evidence adduced at trial indicates that Willie S. and Caprice S. both visited the children consistently during the period in question, and related well with Devon and Luvonia during those contacts. Although he did not successfully complete the Family Ties program, the father also attended six of the 10 sessions, and one successful socialization contact with the children, offered by that agency. Accordingly, the court finds that the petitioner has failed to prove by clear and convincing evidence that either parent, for a period of one year prior to CT Page 8955 April 8, 1996, failed to maintain a reasonable degree of interest or concern for the two children. The counts of abandonment alleged against each respondent are therefor DISMISSED.
With respect to the allegations concerning acts of commission or omission, the court notes that Devon and Luvonia went into foster care on November 1, 1994, and have continuously remained in DCF's custody from that date to the present. C.G.S. §17a-112 (b)(3) authorizes termination of parental rights "where specific acts . . . have caused serious physical or emotional injury to the child." In re Kezia M., 33 Conn. App. 12, 19, (1993); In re Theresa S., 196 Conn. 18, 25-27, 491 A.2d 355
(1985); In re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161
(1992); In re Sean H., 24 Conn. App. 135, 144-45, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991).
Much of the evidence and testimony introduced during this proceeding centered around events and circumstances which transpired between the date of commitment in late 1994 and the termination filing in April 1996. As noted infra, both children were in foster care continuously during this period. There were no allegations during trial of specific acts by the parents which caused serious physical injury or emotional harm to either child. Connecticut case law is clear that children could not have been denied the care guidance or control necessary for their physical, educational, moral or emotional well-being by reason of parental acts which occurred while they were in DCF's custody. In re KeziaM., op. cit., 20; In re Kelly S., op. cit.; In re Shannon S.,41 Conn. Sup. 145, 562 A.2d 79, affirmed, 19 Conn. App. 20,560 A.2d 993 (1989).
The court finds that the petitioner did not satisfy its burden of proving by clear and convincing evidence that either parent engaged in acts of commission or omission during the period of time in question which denied either child the care which was required for his or her well-being. Accordingly, those counts of the TPR petitions are also DISMISSED.
The primary focus of this termination trial was DCF's claim, pursuant to C.G.S. § 17a-112 (b)(2), that the parents failed to satisfactorily rehabilitate following Devon and Luvonia's neglect adjudications in December, 1994. That statutory ground for termination applies in cases where:
"the parents of a child who has been found by the superior CT Page 8956 court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the child, they could assume a responsible position in the life of the child."
The term "personal rehabilitation" as used in the forgoing statute has been defined to mean "the restoration of a parent to his or her former constructive and useful role as a parent." Inre Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). See also In reMigdalia M., R6 Conn. App. 194, 203, (1986).
Both parents promised to obtain substance abuse treatment as a prerequisite to their reunification with Devon and Luvonia. The circumstances surrounding each child's placement in foster care, and their commitment to DCF in 1994, indicate that this particular expectation was both appropriate and warranted. It was absolutely essential that both the mother and father overcome the substance abuse issues which plagued them and necessitated that their children go into state custody.
During the approximately 15 months which elapsed from December 1994 until April 1996, both Willie S. and Caprice S. consistently failed to do what was expected of them with respect to their drug/alcohol abuse.
Following his drug abuse evaluation by the Morris Foundation in October 1995, the father was referred for out-patient treatment there. Despite the foundation's diagnosis that he suffered from alcohol and cocaine dependency — and father's own admission that he had used cocaine three weeks prior to the evaluation and consumed $100 worth of cocaine a week around that time — Willie S. attended only two treatment sessions before dropping out without excuse or explanation. He sought readmittance to the Morris drug treatment program in February 1996 and requested individual therapy sessions which the agency was willing to provide. Once again, however, the respondent failed without explanation to engage in the treatment which was offered.
Caprice S. was referred to numerous substance abuse treatment programs at the Joseph Center and the Morris Foundation following the children's commitment. Her "off-again, on-again" attempts at CT Page 8957 treatment were marked by spotty attendance, non-compliance with program rules and periodic relapses. Ultimately, Caprice S. was discharged twice by the Joseph Center, and four times by the Morris Foundation. She never successfully completed treatment at either program, and she continued to abuse drugs and alcohol, despite promises to DCF and the court that she would cooperate with substance abuse therapy and remain drug-free. The Morris Foundation discharge summary dated April 16, 1996 indicated that mother's prognosis was poor. It noted in pertinent part that the poor prognosis was based "on [mother's] several unsuccessful attempts to remain abstinent in outpatient treatment and continued drug use." (Petitioner's Exhibit 24A).
The inability or unwillingness of each parent to deal with their substance abuse problems and successfully complete drug/alcohol treatment over a 15-month period proves by clear and convincing evidence that they have both failed to achieve a level of rehabilitation which would encourage the belief that they could resume responsible positions in the lives of Devon and Luvonia within a reasonable time. Repeated offers of appropriate help and assistance by patient drug counselors and DCF were either rebuffed, or unsuccessful. Accordingly, the Court finds that the petitioner has met its burden of proof with respect to this statutory ground for termination. The court finds proven by clear and convincing evidence that this ground had existed for not less than one year, and that the petitioner made reasonable efforts to reunify the children with their parents.
DISPOSITION
Contested termination of parental rights trials consist of two distinct phases: the adjudicatory phase, and the dispositional phase. Connecticut Practice Book, § 1042.1, 1043.1; and 1049.1. Although the court may hear evidence as to both adjudication and disposition during the course of the same trial, it must first determine that one of the statutory grounds for termination has been proven before it considers the issue of disposition. Connecticut Practice Book § 1042.1(4); In reValerie D., 223 Conn. 492, 511, 613 A.2d 748 (1992).
Having determined in this case that the petitioner has met its burden of proof with respect to one of the grounds alleged for termination, the court now addresses the issue of disposition. CT Page 8958
The children's foster mother, Sheila R., testified at trial. Sheila R. and her husband have two children of their own, and they are also caring for William S. and Shamika S., who are the brother and sister of Devon and Luvonia. Devon and Luvonia have resided continuously in this foster home since November 1, 1994.
According to Sheila R., Devon was passive and withdrawn when he first arrived at her home. He would not ask express his needs to his foster parents, and would "stiffen" why they attempted to comfort him. Sheila R. has worked with Devon during the past two years in an attempt to get the child to open up emotionally, and believes that Devon has made progress in that area. Devon has not developed physically within the normal range. According to the foster mother, Devon, now three and a half years old, is approximately the same physical size as his younger sister Luvonia. The social study prepared by DCF indicates that Devon was diagnosed as a "Failure to Thrive Child" as an infant, and that this condition was "due to lack of adequate nutrition." (Petitioner's Exhibit 1, page 4). Sheila R. also indicated that Luvonia, now two year's old, is a normal, active child, who has already exceeded Devon in her level of skills. The foster mother indicated that "he [Devon] learns from her."
Devon attends a Family Services Crisis Nursery and a special education pre-kindergarten program. (Petitioner's Exhibit 1, page 24). The DCF social study also notes that "Devon's developmental delays require that his care giver be consistent with a developmental plan." (Petitioner's Exhibit 1, page 24).
Sheila R. indicated that she is willing to adopt Devon and Luvonia. She stated that Devon refers to her as "mom." Ms. McKelvey stated in the social study that both children are "thriving" and "well-adjusted" in Sheila R's home. (Petitioner's Exhibit 1, pages 24, 26.) Both DCF and the child's attorney advocate termination so that the children can be freed for adoption.
Devon has now been in foster care for more than half of his young life, and Luvonia has been in placement for nearly all of hers. During that time, neither parent has been able to overcome the substance abuse problems which contributed to their neglect of both children. The inability of Caprice S. and Willie S. to successfully complete drug/alcohol treatment indicates a lack of insight about the nature of their own problems, and about the well-being of their children. Despite warnings that they could CT Page 8959 lose their children, and despite sincere offers of assistance and treatment by numerous agencies, they have both failed to make any meaningful progress on the path towards rehabilitation and reunification. Furthermore, none of the evidence and testimony considered by the court offers any indication that either parent would be able to complete that journey within a reasonable time in the future.
Before this court may enter judgment, it must make the following findings of fact mandated by C.G.S. § 17a-112 (d):
1. Services offered: DCF offered the mother repeated opportunities to participate in numerous drug treatment programs at the Joseph Center and the Morris Foundation, family preservation and housing assistance through NOW Inc., the services of a parent aid, and assistance in facilitating visitation. DCF offered the father substance abuse evaluation and treatment on two occasions at the Morris Foundation, a parenting class and socialization opportunities through the Family Ties program, and assistance in facilitating visitation. As noted in the social history (Petitioner's Exhibit 1, page 48) other supportive services were provided at DCF's behest to Devon and Luvonia.
2. Reasonable efforts to reunite: The petitioner made reasonable and consistent efforts to reunite both children with their mother and father. These efforts included numerous offers of substance abuse treatment for both parents, the services of a 12-week family preservation program, relocation assistance, parenting classes, a parent aid, visitation., and the assistance of DCF staff. Even after deciding that reunification efforts had failed and that termination would be necessary, DCF delayed filing the TPR petitions in hope that Caprice S. and Willie S. would use the additional time to improve their situations.
3. Court orders: No court orders were issued in this matter. However, at commitment hearing, each respondent signed court-approved expectations in court. These expectations, which have been discussed at length in this memorandum of decision, clearly delineated the actions each parent would have to undertake in order to be reunified with Devon and Luvonia. It is clear that each parent knew and understood what was expected of them by the petitioner, and by the court.
4. Feelings and emotional ties with parents andCT Page 8960caretakers: Devon and Luvonia have resided in their current foster home since November, 1994. Sheila R. and her husband have met the children's day-to-day needs continuously since then. Devon addresses Sheila R. as "mom." Luvonia, now two, has resided with these foster parents since she was several months old. Based on these facts, the court finds that each child regards the foster parents as nurturing parental figures. No psychological studies nor parent-child evaluations were requested in connection with this matter. Both Willie S. and Caprice S. visited consistently with the children and interacted with them appropriately. That evidence leads the court to conclude that both children have knowledge of Willie S. and Caprice S., although it is unclear to what degree, if it all, either child has bonded with the biological parents.
5. Ages of the children: Devon is three years old. Luvonia is two years old.
6. Parental efforts to rehabilitate and reunify: In order to be reunited with their children, Willie S. and Caprice S. each had to receive appropriate treatment and overcome their substance abuse problems. As noted at length above, they both failed to make sustained progress towards rehabilitation and reunification since the children were placed in DCF's custody.
7. Impediments to maintaining meaningful relationships:
DCF offered each parent regular visitation and appropriate supportive services intended to further their rehabilitative efforts. Nothing, including adverse economic circumstances nor the actions of any individual or agency, prevented either respondent from maintaining a meaningful relationship with Devon and Luvonia.
JUDGMENT
Having considered the seven factors above, and having found as proven one of the grounds alleged for the termination of respondents' parental rights, it is further found by clear and convincing evidence that it is in the best interests of Devon S. and Luvonia S. that their parents' rights be terminated so that these children may be freed for adoption. The children's ages, the length of time each has already spent in foster care, the failure of each respondent's efforts at rehabilitation, and the advances which Devon and Luvonia have made in their foster placement all demonstrate that such a disposition is essential CT Page 8961 for each child's well-being.
Accordingly, it is hereby ORDERED that the parental rights of Caprice S. and Willie S. be and hereby are terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed statutory parent for the purpose of securing an adoptive home or other appropriate permanent placement for each child. Said commissioner shall file with the court, no later than 90 days following the date of this judgment, a written report on the progress towards such permanent placements. If adoption has not been finalized by February 5, 1998, then said Commissioner is further ordered to file a Motion for Review of Plan for Terminated Child for each of these children, which shall be heard by the court no later than May 5, 1998.
Entered at Middletown, Connecticut this 6th day of November, 1996.
BY THE COURT:
DYER, J.